**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

No. 4:06-CV-248-FL

CHARLES MATTHEWSON,

Plaintiff

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

**MEMORANDUM AND RECOMMENDATION**

This matter is before the Court upon the parties' cross motions for Judgment on the Pleadings **[DE's 10 & 16]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. Pursuant to 42 U.S. C. § 405(g) and § 1383(c)(3), the underlying action seeks judicial review of the final decision by Defendant denying Plaintiff's application for Disability Insurance Benefits. Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings **[DE-10]** be DENIED and Defendant's Cross-Motion for Judgment on the Pleadings **[DE-16]** be GRANTED.

**Statement of the Case**

Plaintiff applied for DIB on October 31, 2002 alleging that he became unable to work on April 18, 2000. (Tr. 35-36, 74-76). This application was denied at the initial and reconsideration levels of review. Id. at 35-36, 51-58. A hearing was held on February 1, 2005 before an Administrative Law Judge ("ALJ") who found Plaintiff was not disabled during the relevant time period in a decision dated April 28, 2005. Id. at 37-50. On August 9, 2005, the Social Security Administration's Office of Hearings and Appeals vacated the ALJ's decision and remanded the case

back to the ALJ. Id. at 65-66. Subsequently, on May 5, 2006, a new hearing was held before the ALJ for de novo consideration, and the ALJ again concluded that the Plaintiff was not disabled. Id. at 567-604, 12-22. Finally, on September 15, 2006, the Appeals Council denied Plaintiff's request for review of the second ALJ decision, thus rendering this decision the final decision of the Defendant. Id. at 7-9. Plaintiff filed the instant action on November 9, 2006. **[DE-1]**.

**Standard of Review**

The Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Id. "Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, it is this Court's duty to determine both whether the Commissioner's finding that Plaintiff was not disabled is "supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a five-step sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520©. If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f). Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (Tr. 16). At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: 1) a history of cervical laminectomies from C3 through C7, 2) degenerative disc disease, 3) osteoarthritis, 4) obesity, 5) hypertension, and 6) diabetes mellitus. Id. In completing step three, however, the ALJ concluded that these impairments were not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Id. at 16-17.

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to engage in light work activity with additional limitations.

Id. at 17-20. Based on this finding, the ALJ found that Plaintiff could not perform any of his past relevant work. Id. at 20. However, the Vocational Expert ("VE") testified that based on Plaintiff's age, education, past relevant work experience and RFC, he was capable of making a vocational adjustment to other work. Id. at 21. Finally, at step five, the ALJ concluded that the Medical-Vocational Guidelines ("Grids") Rule 202.21 directed a finding that Plaintiff was not disabled at any time through the date of his decision. Id. at 21-22. In making these determinations, the ALJ cited substantial evidence, a summary of which now follows.

Plaintiff sustained back and neck injuries from a motor vehicle accident on April 18, 2000. Id. at 190. Subsequently, in September 2000, Plaintiff underwent decompressive cervical laminectomies from C3-C7. Id. at 16, 139. A year after the laminectomies, Plaintiff was diagnosed with posttraumatic cervical radiculopathy with continued complaints of pain. Id. at 16-17, 216. Plaintiff was also diagnosed with lumbar degenerative disc disease. Id. at 16-17, 190. Despite these diagnoses, Plaintiff's symptoms did not satisfy the requirements outlined in Listing 1.04, which governs disorders of the spine. 20 C.F.R. Part 404, subpart P, App.I. For example, Plaintiff's medical records do not indicate nerve root compression, motor loss consisting of atrophy with associated muscle weakness, sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test. (Tr. 17); 20 C.F.R. Part 404, subpart P, App. I ., Listing 1.04. Instead, during an examination on December 10, 2001, the record reveals Plaintiff had 5/5 muscle strength in his lower extremities and a negative leg raising test. Id. at 17, 198.

From December 2001 through September 2002, Plaintiff received six epidural steroid injections at a pain clinic to sustain pain management for his chronic lower back pain. Id. at 17, 201.

In October 2002, an MRI scan showed degenerative disc disease at L4-5, spondylosis, and disc protrusion. Id. at 18, 200. Several months later, in January 2003, Plaintiff was examined by Dr. E.C. Land. Id. at 18, 214-16. During this visit, the doctor diagnosed him with posttraumatic cervical radiculopathy, morbid obesity, hypertension, hypersomnolence, and venous insufficiency. Id. at 18, 216. In addition, the doctor's examination also revealed Plaintiff could do tandem walking slowly without loss of balance, squat approximately 80% of a full squatting position, and had 5/5 strength in his deltoids and in his feet. Id. Furthermore, there was a decrease in the range of motion present in Plaintiff's spine and extremities but significant effusion or tenderness was not noted. Id. at 18, 215.

Through the date Plaintiff's insured status expired, his examinations indicated a slight decrease in muscle strength on testing from April 2002 through January 2003. Id. at 19, 377-95. In addition, the treatment records also indicate deep tendon reflexes ("DTRs") were symmetrical, gait testing was normal, although slowed, there was pain on palpation in his lower back, and mild tenderness along his spine. Id.

On June 20, 2003, Dr. Hinson treated Plaintiff for complaints of bilateral leg swelling. Id. at 224-25. During the visit, the doctor performed a venous duplex study to determine the cause of Plaintiff's condition. Id. at 18, 224-25. The results of the study indicated Plaintiff suffered from venous hypertension and venostasis ulcerations as a result of his obesity. Id. at 224. However, the results also indicated there was no evidence of deep venous thrombosis ("DVT"); thus the results were normal. Id. at 18, 224-25. Dr. Hinson did not recommend further intervention except for Plaintiff to lose weight and continue wearing his compression stockings. Id. at 18, 224.

Plaintiff continued his treatment for chronic lower back pain at the pain clinic. Id. at 18. On April 9, 2003, Dr. Minard's records indicate supine straight leg raise was negative bilaterally with no muscle weakness noted. Id. at 18, 299. The doctor continued Plaintiff on his medications and also prescribed Oxycontin to improve Plaintiff's pain management so that he could increase his activity, which would allow him to lose weight and become a surgical candidate. Id. at 300. However, subsequent medication checks revealed Plaintiff violated his narcotic agreement resulting in his dismissal from the Center for Pain Medicine. Id. at 18, 289. In addition, Plaintiff's violation also forced Dr. Hinson to discontinue his prescription of Oxycontin and Lorcet as of June 30, 2003. Id. at 18, 283. The examination by the doctor during this visit indicates Plaintiff had edema of the lower extremities with seated straight leg raise that were negative bilaterally. Id. at 283. Plaintiff continued to suffer from degenerative disc disease. Id. at 18, 266, 288, 293.

Over the next several months, Plaintiff had multiple visits with his treating physicians. Id. Overall, each physician's assessment of Plaintiff's condition was consistent. Id. at 18. In September 2003, Plaintiff was able to walk with a normal gait, was able to sit and rise from a seated position without difficulty, and had negative straight leg raising from a seated position. Id. at 18, 272. Plaintiff's condition remained unchanged during examinations in both October and November of 2003, with no weakness noted in Plaintiff's lower extremities. Id. at 18, 262, 267. In December 2003, his gait was still normal and straight leg raising was negative bilaterally in a seated position. Id. at 18, 259. Finally, in January 2004, immediately after the date Plaintiff was last insured, Plaintiff did not exhibit muscle weakness, had equal grip strength, was able to rise from a seated position without difficulty, and had a normal range of motion throughout his cervical spine. Id. at

18, 257.

Plaintiff continued treatment for his symptoms after the date he was last insured. Id. at 18. During an examination in November 2004, he exhibited seated straight leg raising which remained negative bilaterally with no evidence of lower extremity weakness. Id. at 18, 305. Additional medical records indicate Plaintiff sought treatment, from Dr. Dixon and other physicians at the Cashie Medical Center, for his cervical radiculopathy with chronic back pain, hypertension, diabetes mellitus, degenerative joint disease, and morbid obesity through May 2005. Id. at 18-19, 367. Although Plaintiff has been consistently diagnosed with hypertension and diabetes, the medical records do not demonstrate that Plaintiff has associated chronic heart failure or ischemic heart disease with chest pain associated with myocardial ischemia, as required by Listings 4.02 and 4.04. 20 C.F.R. Part 404, subpart P, App.I. The evidence also does not demonstrate Plaintiff has diabetic neuropathy, frequent acidosis, or retinitis proliferans, which is required by Listing 9.08. Id.

Dr. Dixon completed a medical source statement of Plaintiff's ability to do work-related activities on February 24, 2005. Id. at 19, 519-23. In the statement, the doctor reported that Plaintiff suffered from several restrictions. Id. These restrictions indicate Plaintiff is limited to lifting and carrying less than ten pounds, sitting, standing, and walking less than two hours each in an eight hour work day, pushing and pulling, performing postural vibration, humidity, wetness, hazards, or fumes, odors, chemicals or gases. Id. In addition, in a letter dated May 25, 2005, the doctor stated Plaintiff "suffers from many musculoskeletal conditions and because of these conditions he is currently not able to work . . . his musculoskeletal problems [have] rendered him disabled." Id. at 459.

The final medical evaluation in the record was an examination in July 2005 Id. at 17. During this examination, Plaintiff was diagnosed with osteoarthritis in his right knee. Id. However, the records do not show that Plaintiff's condition satisfied the requirements outlined in Listing 1.02. 20 C.F.R. Part 404, subpart P, App.I. Specifically, he does not have major dysfunction of a joint with signs of limitation of motion that results in an inability to ambulate effectively prior to the date he was last insured. Id.

To assist the ALJ in determining Plaintiff's RFC, he consulted a medical expert, Dr. Cannon. Id. at 590-600. Dr. Cannon thoroughly examined all of Plaintiff's medical records and concluded that there was sufficient information for her to form an opinion. Id. at 591. The doctor determined that Plaintiff has had several diagnoses including decompressive cervical laminectomies, cervical radiculopathy, chronic low back pain, degenerative disc disease, ten percent impairment in his spine, hypertension, obesity, diabetes, skin ulcerations on his lower extremities, and an adjustment disorder with a depressed mood. Id. at 591-93. Despite these diagnoses, Dr. Cannon concluded that none of Plaintiff's impairments, singular or in combination, met or equaled the requirements of the listing of impairments. Id. at 593. The doctor also determined that even though Plaintiff has "definite limitations," he could still lift a maximum of twenty pounds, he was limited in his stair climbing, steps, and heights, and his medications would prevent him from working around heights or dangerous machinery. Id. She also opined that a sit/stand option would be appropriate for Plaintiff. Id. at 594.

During the hearing in this matter, Plaintiff testified that despite epidural injections, physical therapy, and aquatic therapy to lessen his pain, he is unable to work due to problems with his back,

legs, knees, arms and neck. Id. at 19. In addition, he is unable to lift and carry over ten pounds, sit or stand more than 30 minutes at a time, and walk more than one-fourth mile. Id. at 19. Plaintiff denied that he had been walking on a treadmill or at a local school for exercise. Id. at 20. He stated that his medication helps manage his pain, but the pain is not totally relived. Id. Plaintiff also reported that he participates in various chores and social activities including dusting, with no other housework attempted, reading the Bible, watching television, going grocery shopping, and attending church. Id. His work-related activities included repairing lawn mowers in the past, but he denied involvement in his wife's flea market business. Id. Furthermore, his wife testified Plaintiff was not involved in her flea market business and that he gets easily frustrated and is forgetful. Id.

With regard to Plaintiff's testimony, the ALJ made the following findings:

> Prior to the date he was last insured, the claimant's subjective allegations are not considered fully credible. The claimant was taking several forms of pain medication and it is recognized he was experiencing some degree of pain. However, the evidence shows he violated his narcotic agreement and on one occasion was counseled to stop mixing his medications but to take them as prescribed. On several examinations during the time period in question, the claimant reported he was doing well, with improvement noted in the pain he was experiencing. Additionally, the claimant was not instructed by an examining physician to refrain from engaging in normal daily activities or to refrain from working at least at the light level of exertion. While Dr. Dixon noted the claimant was unable to engage in work activity, this assessment was completed in February 2005, more than one year after the date the claimant was last insured and is not given great weight due to the time frame and the reported inconsistencies in Dr. Dixon's records. The claimant's testimony as to his other activities is also compromised by his own statements in the record. While the claimant testified his wife did the work for the flea market set-up, he reported to his physical therapist in March 2004, that he did some of the set up work for the vendor booth, taking rest breaks when needed. The claimant also reported to his physical therapist that he had a lawn mower repair business, and also used free weights at home, including bench pressing. The claimant was also a volunteer for Meals on Wheels. While the claimant's report to his physical therapist was after the date he was last insured, these statements are relevant to the time period involved as the claimant was involved in these activities for more than a short period of time. These

> activities show the claimant did not lead a sedentary lifestyle prior to the date he was last insured and compromise his allegations of an inability to engage in any work-related activity.
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

Id. at 20.

After weighing this evidence, and considering the opinion of Dr. Cannon, the ALJ determined that Plaintiff retained the RFC to perform light work. Id. at 18. Specifically, the ALJ found that:

> [t]hese findings show the claimant was capable of engaging in light work activity prior to the date he was last ensured, lifting and carrying up to 20 pounds occasionally and ten pounds frequently, with the requirement of a sit/stand option, alternating sitting and standing every 30 minutes, performing postural activities only occasionally, and no working around hazards or climbing, which work-related activities were testified to by Dr. Cannon. Dr. Cannon testified that she considered the entire record when making a conclusion as to the claimant's restrictions and included the claimant's obesity in this assessment.

Id.

Finally, a Vocational Expert ("VE") testified at the administrative hearing. Id. at 21, 600-604. Based on the ALJ's RFC determination, the VE opined that a person of Plaintiff's, age, education, work experience, and RFC, could perform the occupations of office helper, mail sorter, and parking lot attendant. Id. at 21. Each of these jobs exist in significant numbers in the national economy. Id. Accordingly, the ALJ concluded that a finding of "not disabled" was appropriate. Id. at 22.

Based on the foregoing record, the Court hereby finds that there was substantial evidence to support the ALJ's conclusions. The undersigned shall now address Plaintiff's specific assignments of error.

## Assignments of Error

### A. The ALJ Did Not Err When Determining Plaintiff's Residual Functional Capacity.

Plaintiff's argument regarding his RFC is twofold. First, he asserts the ALJ erred by not taking into account all of his physical limitations when reaching the conclusion that Plaintiff could perform "light work." **[DE-11, p. 16]**. Plaintiff contends that some of the limitations that would prevent him from performing "light work" include his ability to sit and stand for approximately thirty minutes before having to change positions, his inability to lift more than ten pounds, the fact that "he spends a typical day watching television, sitting and resting," his difficulty staying awake, and the trouble with his memory **[DE-11, p. 16]**.

While Plaintiff couches his argument in terms of the limitations the ALJ failed to discuss, what he is really challenging is the ALJ's determination that Plaintiff's testimony was not entirely credible. The ALJ stated that "although the evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain and other symptoms alleged, the evidence does not support the claimant's allegations of the intensity and persistence of such pain and other symptoms prior to the date last insured." (Tr. 19). As discussed above, in reaching this conclusion, the ALJ noted the following:

> [T]he claimant testified he is unable to work due to problems with his back, legs, knees, arms and neck. The claimant stated he had undergone injections in an attempt to lessen his pain, and has undergone physical therapy, aquatic therapy, and takes pain medication. As a result of the pain he experiences, the claimant testified he is unable to lift and carry over ten pounds, is unable to sit or stand more than 30 minutes at one time and is unable to walk more than one-fourth mile. The claimant denied he had walked on a treadmill for exercise and denied walking at a school for exercise. The claimant stated that medication helps lessen his pain but it is not totally relieved. Activities for the claimant were reported as dusting, with no other housework attempted, reading the Bible, watching television, going grocery shopping occasionally and attending church. The claimant testified he repaired lawn mowers in the past and that he was not involved in the flea market business, but that his wife was for a few months. Testimony was also elicited from the claimant's wife, who supported the claimant's testimony as to his lack of involvement in her flea market

> business and testified the claimant gets easily frustrated and is forgetful. This testimony is but one factor in assessing the claimant's subjective complaints.
> Prior to the date last insured, the claimant's subjective allegations are not considered fully credible. The claimant was taking several forms of pain medication and it is recognized he was experiencing some degree of pain. However, the evidence shows he violated his narcotic agreement on one occasion and he was counseled to stop mixing his medications but to take them as prescribed. On several examinations during the time period in question, the claimant reported he was doing well, with improvement noted in the pain he was experiencing. While Dr. Dixon noted the claimant was unable to engage in work activity, this assessment was completed in February 2005, more than one year after the date the claimant was last insured and is not given great weight due to the time frame and the reported inconsistencies in Dr. Dixon's own records. Additionally, the claimant was not instructed by an examining physician to refrain from engaging in normal daily activities or to refrain from working at least at the light level of exertion. The claimant's testimony as to his other activities is also compromised in his own statements in the record. While the claimant testified his wife did the work for flea market set-up, he reported to his physical therapist in March 2004, that he did some of the set up work for the vendor booth, taking rest breaks when needed. The claimant also reported to his physical therapist that he had a lawn repair business, and also used free weights [at] home, including bench pressing. The claimant was also a volunteer for Meals on Wheels. While the claimant's report to his physical therapist was after the date he was last insured, these statements are relevant to the time period involved as the claimant was involved in these activities for more than a very short period of time. These activities show the claimant did not lead a sedentary lifestyle prior to the date he was last insured and compromise his allegations of an inability to engage in any work related activity. After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

(Tr. 19-20).

The record reflects that contrary to Plaintiff's argument, the ALJ considered all of the limitations that Plaintiff cited in his testimony. However, when making his determination regarding Plaintiff's RFC, the ALJ weighed these restrictions against the other evidence in the record and did not find them to be entirely credible. The Court notes "[i]n reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or

substitute its judgment for that of the secretary." Mastro, 270 F.3d at 176 (quoting Craig, 76 F.3d at 589). More importantly, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citation omitted). Accordingly, because the ALJ's determination regarding Plaintiff's RFC is supported by substantial evidence, Plaintiff's argument is meritless.

Plaintiff next alleges that "ALJ Perlowski did not discuss what factors were used to determine Plaintiff's RFC." **[DE-11, p. 16]**. Specifically he claims, "[a]n ALJ's conclusory statement concerning a claimant's abilities are not sufficient; that the ALJ must specify the functions which the claimant is capable of performing." In support, Plaintiff cites Urtz v. Callahan, 965 F. Supp. 324, 327 (N.D.N.Y. 1997). Plaintiff's argument is unpersuasive. In his opinion, the ALJ provides detailed analysis of the medical records that he used to determine Plaintiff's RFC. (Tr. 17-18). As previously mentioned, some of the conditions that the ALJ noted include the following:

> The claimant continued treatment at a pain clinic with examination on April 9, 2003, showing negative straight leg raising and no muscle weakness noted. The claimant was continued on medication with medication checks showing some violation of his narcotic agreement, forcing discontinuation of Oxycontin and Lorcet as of June 30, 2003. The claimant's diagnosis of degenerative disc disease remained unchanged. Examination on September 25, 2003, showed the claimant was able to walk with a normal gait, was able to sit and arise from a seated position without difficulty, and had negative straight leg raising from a seated position. Examination on October 23, 2003, remained unchanged as did examination on November 20, 2003, with no weakness noted in the claimant's lower extremities. When the claimant was examined on December 18, 2003, his gait remained within normal limits and straight leg raising was negative bilaterally in a seated position. Examination on January 29, 2004, immediately after the date the claimant was last insured, shows he did not exhibit muscle weakness, had equal grip strength, was able to rise from a seated position without difficulty and had a normal range of motion throughout his cervical spine.

Id. at 18.

In addition to these findings, the ALJ also consulted Dr. Cannon, a medical expert, to determine Plaintiff's RFC. Id. "Dr. Cannon testified that she considered the entire record when making a conclusion as to the claimant's restrictions and included the claimant's obesity in this assessment." Id. Based on her medical opinion, Plaintiff was capable of performing light work prior to the date he was last insured, with some restrictions. Id. The doctor noted that Plaintiff could carry up to 20 pounds occasionally and ten pounds frequently with the requirement of a sit/stand option, alternating sitting and standing every 30 minutes, performing postural activities only occasionally, and no working around hazards or climbing. Id. Thus, because Dr. Cannon's assessment was consistent with Plaintiff's medical records as a whole, the ALJ adopted these findings. Therefore, this evidence demonstrates that the ALJ did indeed discuss the factors that were used to determine Plaintiff's RFC and even consulted expert testimony to support his conclusions. As a result, Plaintiff's argument is without merit.

**B. The ALJ Properly Rejected the Medical Opinion of Plaintiff's Treating Physician.**

Plaintiff contends the ALJ erred by not giving controlling weight to the medical opinion of Dr. Dixon and his other treating physicians. "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). "Rather, according to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 1999 U.S. App. LEXIS 307, 7 (4th Cir.1999) (internal quotations omitted).

In the order, the ALJ explained his reasons for giving Dr. Dixon's opinion less than controlling weight and these reasons are supported by substantial evidence. The ALJ discounted the doctor's opinion because the restrictions cited by the doctor were not "supported by [her] own records as a whole and as related to the date the claimant was last insured." (Tr. 19). In addition, Dr. Dixon submitted a medical source statement of ability to do work-related activities on February 24, 2005. Id. "While Dr. Dixon noted the claimant was unable to engage in work activity, this assessment was completed . . . more than one year after the date the claimant was last insured and is not given great weight due to the time frame and the reported inconsistencies in Dr. Dixon's records." Id. at 20.

In the medical source statement, Dr. Dixon concluded Plaintiff was limited to lifting and carrying less than ten pounds, sitting, standing, and walking less than two hours each in an eight-hour work day, pushing and pulling, performing postural activities, and performing manipulative functions. Id. at 19. Dr. Dixon also opined that Plaintiff could not work at temperature extremes, around vibration, humidity, wetness, hazards, or fumes, odors, chemicals or gases. Id. Furthermore,

in a letter dated May 25, 2005, the doctor indicated that Plaintiff "suffers from many musculoskeletal conditions and because of these conditions he is currently not able to work . . . his musculoskeletal problems [have] rendered him disabled." Id. at 459.

The ALJ concluded Dr. Dixon's opinions were inconsistent with her own medical records. Id. at 19. Shortly after the doctor submitted her medical source statement, she examined Plaintiff on April 7, 2005. Id. During this examination, Plaintiff "reported he was doing reasonably well, with no complaints with the exception of muscle spasms in his right chest thought to be due to strenuous activity" that he had performed. Id. Plaintiff's remarks that he was doing "reasonably well" are wholly inconsistent with the restrictions noted by the doctor in the medical source statement in February 2005. Additionally, they contradict her conclusions in the May 2005 letter that Plaintiff suffered from limitations that were so severe they prevented Plaintiff from working. As a result, the ALJ found that Dr. Dixon's opinions were not probative.

Nonetheless, the Plaintiff still challenges the ALJ's conclusion by arguing that "ALJ Perlowski simply based his opinion on one medical record from Dr. Dixon." **[DE-11, p. 20]**. This assertion is incorrect. The record reveals that the ALJ weighed additional evidence *and* testimony before rejecting Dr. Dixon's opinion. Notably, prior and subsequent to the date Plaintiff was last insured, medical examinations by Dr. Dixon and Dr. Hinson indicate Plaintiff's physical condition was not as dismal as Dr. Dixon had previously claimed.

To illustrate, during an examination by Dr. Hinson in July 2003, Plaintiff reported he had been doing well since he was last seen, he was walking and lifting weights more (with some limitations) to facilitate weight loss, and a change in his medication seemed to help with pain

management. Id. at 373. Similarly, in a follow-up visit with Dr. Dixon in October 2003, Plaintiff did not note any new problems and the doctor did not indicate that Plaintiff had any limitations. Id. at 371. Furthermore, in March 2004, which was three months after Plaintiff's date last insured, Plaintiff told the doctor he was "doing reasonably well," he was "without complaint except his usual chronic pain complaint," and he was still actively involved in community service activities. Id. at 370.

Dr. Dixon's conclusions that Plaintiff was unable to work because he is disabled was further undermined by testimony from another medical expert. During the hearing, the ALJ consulted Dr. Cannon to render an opinion regarding Plaintiff's condition in light of the evidence. Id. at 590-600. Based on her thorough examination of Plaintiff's records, she disagreed with Dr. Dixon's assessment by concluding that although Plaintiff has limitations, these limitations did not preclude him from working. Id. at 594. Basically, she did not understand what information Dr. Dixon was formulating his opinions from when his own treatment records indicate that Plaintiff had been doing reasonably well for some time. Id. at 599.

Furthermore, Plaintiff also asserts it was error for the ALJ to reject the medical opinion of his other treating physicians, Dr. Reeg and Dr. Miller, who both concluded that Plaintiff was limited to "sedentary duty." **[DE-11, p. 22]**. First, it should be noted that "sedentary work" is a term of art, defined by the regulation as work that involves lifting no more than 10 pounds at a time with occasional lifting and carrying articles such as docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). In addition, although work in this category involves sitting, a certain amount of walking and standing is also necessary. Id.. On the other hand, the term "sedentary duty" does not

have a specific definition within the regulations and thus does not necessarily correspond to any of the categories that are listed. Second, "[w]hen it comes to administrative determinations of an insured's ability to work, the ALJ is solely responsible for determining the insured's residual functional capacity," not the physician. Rogers v. Barnhart, 204 F. Supp. 2d 885, 893 (W.D.N.C. 2002). Thus, the ALJ is not required to adopt the medical opinion of physicians, especially when they are not based on the requirements listed in the regulations.

In sum, all of the aforementioned evidence is more than enough to establish that the ALJ had substantial evidence when concluding that Dr. Dixon's opinions were not credible and that the opinions of Plaintiff's other treating physician were not entitled to controlling weight. Therefore, Plaintiff's argument is without merit.

**C. The ALJ's Determination That There Are Jobs in the National Economy That Plaintiff Can Perform is Supported by Substantial Evidence.**

In Plaintiff's final assignment of error, he challenges the ALJ's conclusion that he has the ability to perform jobs that are in the national economy **[DE-11, pgs. 25-27]**. Specifically, he alleges that the VE's testimony was deficient because "the ALJ's hypothetical failed to include Plaintiff's need to use a cane in order to ambulate effectively as well as Plaintiff's inability to concentrate." **[DE-11, p. 27]**. During the hearing, the VE provides information to assist the ALJ in determining whether there is work in the national economy that the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). "In order for a vocational expert's opinion to be relevant or helpful, it must be based on a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. Id. (citing Stephens v. Secretary of Health, Educ. and Welfare, 603 F.2d 36, 41 (8th Cir. 1979)).

However, the hypothetical presented to the VE need only include the impairments and limitations that the ALJ finds credible. See Mickles v. Shalala, 29 F.3d 918, 929 (4th Cir. 1994) (Luttig, J., concurring) (noting that in the hypothetical to the vocational expert, the ALJ did not include the restrictions alleged by the claimant because he "found those allegations to be incredible"). Thus, "a hypothetical question is unimpeachable if it *adequately reflects* a residual functional capacity for which the ALJ had sufficient evidence." Fisher v. Barnhart, 181 Fed. Appx. 359, 364 (4th Cir. 2006) (citing Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005)) (alteration in original) (internal quotations omitted).

In the order, the ALJ properly weighed all of the medical evidence and specifically cited Plaintiff's limitations in the hypothetical.

> [T]he claimant's ability to perform all or substantially all of the requirements of this level of [light] work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity, including limitations to light work with no lifting and carrying more than 20 pounds occasionally and ten pounds frequently, alternating sitting and standing every 30 minutes, engaging in occasional but not frequent postural activities and no working around hazards or climbing.

(Tr. 21).

The record reflects that the ALJ did indeed fail to discuss Plaintiff's "need to use a cane . . . or inability to concentrate" in the hypothetical posed to the VE. However, as discussed, *supra*., the ALJ did not find Plaintiff's testimony regarding these limitations to be credible. In short, the ALJ properly determined that these restrictions were not supported by substantial evidence. Moreover, the limitations the ALJ did mention were supported by substantial evidence. Thus, the Plaintiff's arguments are meritless.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-10]** be DENIED, Defendant's Motion for Judgment on the Pleadings **[DE-16]** be GRANTED, and the final decision by Defendant be AFFIRMED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 21st day of September, 2007.

William A. Webb
U.S. Magistrate Judge